**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

CASE NO. 14-cv-7129 (PAE)

PERMISSION DATA, LLC,                          **JURY TRIAL DEMANDED**

      Plaintiff/Counter-Defendant,

      v.

NEWSMAX MEDIA, INC.,

      Defendant / Counter-Plaintiff.

_____/

**NEWSMAX MEDIA, INC.'S ANSWER, AFFIRMATIVE DEFENSES
AND COUNTERCLAIM**

Defendant/counter-plaintiff, Newsmax Media, Inc. ("Newsmax") hereby submits its Answer, Affirmative Defenses and Counterclaim in response to the complaint ("Complaint") filed on behalf of the plaintiff/counter-defendant, Permission Data, LLC ("Permission Data"). Newsmax denies each and every allegation not specifically admitted herein and states to each correspondingly numbered paragraph of the Complaint as follows:

**Nature of the Action**

1.      Newsmax denies Permission Data's misleading characterization of the alleged nature dispute (the true character of which is delineated in Newsmax's Counterclaim), as well as all allegations contained in paragraph 1 of the Complaint.

2.      Newsmax admits that Permission Data purports to bring a claim seeking damages, but denies that Permission Data is entitled to any relief, of any kind or nature, against Newsmax.

**Parties**

3.      Newsmax admits that Permission Data is a limited liability company organized under the State of New York.  Newsmax further admits that Permission Data purports to be a

marketing company.

4.    Newsmax admits that it is a Delaware corporation with its principal place of business in West Palm Beach, Florida.

5.    Newsmax does not challenge this Court's jurisdiction over the matter.

## Facts[1]

6.    Newsmax admits that the parties executed a document entitled, "Terms and Conditions," and that a copy of this document is annexed to Permission Data's Complaint as Exhibit A.   Newsmax denies all characterization of the Terms and Conditions, and states that the provisions referenced by Permission Data are included within a larger document that includes numerous other terms and conditions that supplement, influence and place the parties' respective obligations and liabilities into proper context. Newsmax respectfully refers the Court to the provisions of the Terms and Conditions and resulting insertion orders as they speak for themselves.   Newsmax denies all characterization of the Terms and Conditions and resulting insertion orders, as well as all of the remaining allegations contained in paragraph 6 of the Complaint.

7.    Newsmax admits that Permission Data has issued Newsmax a series of invoices in connection with services that Permission Data purports to have rendered.   Newsmax denies all remaining allegations contained in paragraph 7 of the Complaint.

8.    Newsmax admits that Permission Data has already received $1,010,978.00 from Newsmax as a result of fraudulent activities. Newsmax further admits that, in an attempt to portray itself a victim as opposed to a perpetrator, Permission Data has initiated a lawsuit in which it claims that Newsmax owes Permission Data an additional $274,401.50. Newsmax

---

[1] To the extent that the heading, "Facts" suggests the Permission Data's articulation of the underlying facts is factual in nature, Newsmax denies the same.

denies all remaining allegations contained in paragraph 8 of the Complaint.

9.      Newsmax admits that Permission Data's fraud was initially successful, and thwarted Newsmax's ability to immediately detect Permission Data's underlying deceit. Newsmax denies all remaining allegations contained in paragraph 9 of the Complaint.

10.     Newsmax admits that the Terms and Conditions provides that Newsmax has ten business days to challenge the issued invoices, but states that the language referenced by Permission Data is included within a larger document that includes numerous other terms and conditions that supplement, influence and place the parties' respective obligations and liabilities in proper context. Newsmax respectfully refers the Court to the provisions of the Terms and Conditions and resulting insertion orders as they speak for themselves.  Newsmax denies all characterization of the Terms and Conditions and resulting insertion orders as well as all of the remaining allegations contained in paragraph 10 of the Complaint.

11.     Newsmax denies the allegations contained in paragraph 11 of the Complaint.

## First Cause of Action
### (breach of contract)

12.     Newsmax re-alleges and incorporates its responses to paragraphs 1 through 11 as if set forth fully herein.

13.     Newsmax admits that, pursuant to the Terms and Conditions and resulting insertion orders, it agreed to compensate Permission Data for each new, legitimate, non-computer generated, viable lead – *i.e.*, for each email address that was not already in Newsmax's existing database.  Newsmax respectfully refers the Court to the provisions of the Terms and Conditions and resulting insertion orders as they speak for themselves.  Newsmax denies all characterization of the Terms and Conditions and resulting insertion orders, as well as all of the remaining allegations contained in paragraph 13 of the Complaint.

14.     Newsmax denies the allegations contained in paragraph 14 of the Complaint.

15.     Newsmax denies the allegations contained in paragraph 15 of the Complaint.

16.     Newsmax denies the allegations contained in paragraph 16 of the Complaint.

17.     Newsmax denies the allegations contained in paragraph 17 of the Complaint.

**Second Cause of Action**
**(account stated)**

18.     Newsmax re-alleges and incorporates its responses to paragraphs 1 through 17 as if set forth fully herein.

19.     Newsmax denies the allegations contained in paragraph 19 of the Complaint.

20.     Newsmax denies the allegations contained in paragraph 20 of the Complaint.

21.     Newsmax denies the allegations contained in paragraph 21 of the Complaint.

22.     Newsmax denies the allegations contained in paragraph 22 of the Complaint.

**Third Cause of Action**
**(quantum meruit)**

23.     Newsmax re-alleges and incorporates its responses to paragraphs 1 through 22 as if set forth fully herein.

24.     Newsmax lacks knowledge or information sufficient to form a belief as to whether Permission Data expected to be paid for the fraudulent leads that it tendered to Newsmax.  Newsmax denies the remaining allegations contained in paragraph 24 of the Complaint.

25.     Newsmax denies the allegations contained in paragraph 25 of the Complaint.

26.     Newsmax denies the allegations contained in paragraph 26 of the Complaint.

**Fourth Cause of Action**
**(unjust enrichment)**

27.     Newsmax re-alleges and incorporates its responses to paragraphs 1 through 26 as

if set forth fully herein.

28.     Newsmax denies the allegations contained in paragraph 28 of the Complaint.

29.     Newsmax denies the allegations contained in paragraph 29 of the Complaint.

30.     Newsmax denies the allegations contained in paragraph 30 of the Complaint.

### Fifth Cause of Action
**(attorneys' fees)**

31.     Newsmax re-alleges and incorporates its responses to paragraphs 1 through 30 as if set forth fully herein.

32.     Newsmax respectfully refers the Court to the provisions of the Terms and Conditions and resulting insertion orders as they speak for themselves.  Newsmax denies all characterization of the Terms and Conditions and resulting insertion orders, as well as all of the remaining allegations contained in paragraph 32 of the Complaint.

33.     Newsmax lacks knowledge or information sufficient to form a belief as to the allegations contained in paragraph 33 of the Complaint and, therefore, denies the same.

34.     Newsmax denies the allegations contained in paragraph 34 of the Complaint.

In response to the unnumbered "Wherefore" paragraph following paragraph 34, Newsmax denies that Permission Data is entitled to any of the relief requested in sub-paragraphs (a)-(f).

### AFFIRMATIVE DEFENSES

As and for its affirmative defenses, Newsmax states as follows:

### *First Affirmative Defense*

Permission Data's claims are barred, in whole or part, by its failure to state a cause of action upon which relief can be granted.

### Second Affirmative Defense

Permission Data's claims are barred, in whole or part, as it fraudulently induced Newsmax into entering into its Terms and Conditions, as well as each of the five separate insertion orders (collectively, the "Agreements") by knowingly, falsely and intentionally misrepresenting that Permission Data: (a) has an unwavering commitment to delivering reliable and clean leads; (b) has been delivering positive results for hundreds of brand advertisers since 2002; (c) employs stringent, quality control processes, including proprietary data validation and management system, to ensure the delivery of "clean, actionable leads;" (d) conducts evaluations to ensure quality and performance; (e) diligently vets all third-party websites that it uses; (f) supplies legitimate, non-bot generated user clicks and survey responses; and (g) does not utilize bots to create artificially enhanced click activity.

### Third Affirmative Defense

Permission Data's claims are barred, in whole or part, as the Agreements are the product of fraud and, therefore, null and void, voidable and/or legally unenforceable.

### Fourth Affirmative Defense

Permission Data's claims are barred, in whole or part, by its fraudulent behavior, which is articulated in full in Newsmax's Counterclaim (and incorporated herein by reference), and which includes systematically triggering a bot resulting in fraudulent email leads; engaging in a scheme designed to hide its fraudulent activity from detection; and knowingly accepting unwarranted payments.

### Fifth Affirmative Defense

Newsmax's obligations, if any, to perform under the Agreements were waived, rendered impossible, and/or excused by Permission Data's prior breaches – both express and implied – of

the Agreements.

### Sixth Affirmative Defense

Permission Data's claims are barred, in whole or in part, by the doctrine of unclean hands.

### Seventh Affirmative Defense

Permission Data's claims are barred because Permission Data has suffered no damages as a result of any act or omission committed by Newsmax.

### Eighth Affirmative Defense

Permission Data's claims are barred to the extent that Permission Data has not suffered any damages as a result of any act or omission committed by Newsmax and, to the contrary, has in fact been unjustly enriched and overpaid, as it has received more financial compensation than it was entitled to based on the "services" that it actually rendered to Newsmax (as opposed to what it represented, promised, agreed and contracted to deliver).

### Ninth Affirmative Defense

Permission Data's claims are barred because Newsmax performed its obligations under the Agreements and, at all times, acted in good faith.

### Tenth Affirmative Defense

To the extent that Permission Data has sustained any damages, such damages were caused by Permission Data's acts and/or omissions and/or the acts and omissions of third-parties.

### Eleventh Affirmative Defense

Permission Data failed to perform the requisite conditions precedent to Newsmax's performance under the Agreements, thereby obstructing and/or rendering Newsmax's performance impossible.

*Twelfth Affirmative Defense*

Newsmax is entitled to a set-off against any recovery that may be had by Permission Data in an amount equal to the damages caused by Permission Data's fraudulent misrepresentations, fraud, unclean hands and breaches of the Agreements.

*Thirteenth Affirmative Defense*

Permission Data failed to take appropriate steps to mitigate, minimize, or avoid the damages it allegedly suffered, and its damages, if any are awarded, should be reduced by the extent that it failed to mitigate, minimize or avoid them.

*Reservation of Rights*

Newsmax reserves the right to assert additional defenses or claims, as they become known during the course of discovery.

**WHEREFORE**, Newsmax respectfully requests that this Court issue judgment in its favor, dismiss Permission Data's Complaint, and grant Newsmax such other and further relief as the Court deems just and proper, including but not limited to an award of attorneys' fees and costs.

## COUNTERCLAIM

Defendant and counter-plaintiff, Newsmax Media, Inc. ("Newsmax"), hereby sues plaintiff and counter-defendant, Permission Data, LLC ("Permission Data") and alleges as follows:

## INTRODUCTION

1.      Newsmax sought to expand its email database through online marketing surveys, but was wary of the online marketing industry's infamously fraudulent practices.  Permission Data represented itself to Newsmax as a paradigm of integrity within the online marketing

industry.  Based on express written and oral representations, Newsmax engaged Permission Data to selectively place online surveys in order to acquire novel email addresses.  Upon discovering irrefutable evidence that the acquired email addresses were generated by the same fraudulent practices which Permission Data explicitly disavowed, Newsmax ended the relationship and demanded a refund. Instead of owning up to its hypocrisy, Permission Data raced to the courthouse to demand payment in full.

## JURISDICTION AND VENUE

2.      Newsmax is a Delaware corporation with its principal place of business located at 560 Village Boulevard, Suite 120, West Palm Beach, Florida 33409.

3.      Permission Data is a limited liability company organized under the law of the State of New York with its principal place of business located at 451 Park South, New York, New York 10016. As further outlined below, Permission Data purports to be a professional marketing company.

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as Newsmax and Permission Data are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of attorneys' fees and costs.

5.      This Court has personal jurisdiction over Permission Data by virtue of its initial complaint, as well as the fact that Permission Data is a New York limited liability company that purposefully operates, conducts, engages in and/or transacts business in the State of New York. This Court further has jurisdiction over this matter as the parties have contractually consented to jurisdiction in this state.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1409.

7.      All conditions precedent to the prosecution of this action have been satisfied,

fulfilled, extinguished, waived or otherwise executed.

## THE PARTIES

8.      Newsmax is an acclaimed multimedia news organization which provides in-depth and comprehensive coverage of news, politics, and independent commentary though its website (www.newsmax.com), monthly magazine (*Newsmax*) and, most recently, NewsmaxTV, which is available in 35 million households throughout the United States via DirecTV and Dish Network.

9.      Newsmax is known for its consistent political commentary delivered through a stable of respected correspondents and pundits.  Newsmax's media properties feature a multitude of respected and significant news personalities, including, among others: Alan Derwoshitz, Ben Stein, George Will, Kathleen Parker and Susan Estrich.

10.     Newsmax magazine has, on multiple occasions, been awarded with the prestigious Gold Eddie award for its journalism – the highest distinction for magazines.

11.     Newsmax magazine boasts a readership of 500,000 monthly readers nationwide, while its website receives 10 million unique monthly visitors – a figure which, according to comScore, ranks it among the most viewed websites in the news / politics category. In addition to its media activities, Newsmax publishes a series of newsletters, both online and in traditional print.

12.     Permission Data is a marketing company that purports to offer an array of services to a wide clientele, including advertisers, agencies and publishers. With respect to advertisers, Permission Data's website boasts that "Fortune 500 Brands rely on Permission Data for Customer Acquisition." (*See* www.permissiondata.com).

13.     Permission Data purports to assist its clients in acquiring customers by serving as an online advertising network or "ad network," placing its clients' online advertisements and

associated campaigns on select third-party websites, whose sites are most relevant to the advertiser's campaign. Simply put, Permission Data is an online matchmaker, interconnecting advertisers, publishers (*i.e.*, the websites that host the advertisements) and prospective consumers through online advertising that appears in a multitude of forms, most prominently in website advertisements, but also in RSS feeds, on blogs, in instant messaging applications, in adware, emails and other sources. The objective is to introduce the prospective consumer with the advertiser's products and services, often by directing them to the advertiser's homepage.

## FACTUAL BACKGROUND

**A.**     ***The Ad Network Industry and the Perils of Click Fraud***.

14.     Most ad networks target and work with both publishers and advertisers. Advertisers pay the ad networks for the dissemination of their advertising campaigns, while the publishers either charge a fee to display the advertisement, or enter into revenue share agreements with the ad network.

15.     Not all ad networks are created equally. A valued, online ad network expertly aggregates ad space supply, and efficiently delivers advertisements to the targeted demographic with a "brand safe" reach while increasing the advertiser's bottom line.

16.     Unlike traditional media advertising agencies, online ad networks offer the added benefit of measuring the success of their "matchmaking skills" by targeting, tracking and reporting the number of qualified consumer "clicks."

17.     Ad networking is a multi-billion dollar industry populated by a number of large players, including: Google's AdSense, Tribal Fusion, AdBrite, Yahoo! Search Marketing, Value Click, Casale Media, and Pulse360.

18.     Advertisers pay ad networks through a number of different models, including

CPM (clicks per impression),[2] CPC (cost per clicks),[3] and CPA (cost per action, or cost per acquisition).[4]

19.     Regrettably, ad networks can and do game the system.  For example, unscrupulous ad networkers employ malicious "bot technology." An internet bot, also known as a web bot or "clickbot," is a software application that runs automated, repetitive tasks at a frequency impossible for human duplication. A fraudulent clickbot, for example, clicks on advertisements (issuing HTTP requests on advertiser's webpages or advertisements) giving the appearance of generating high-volume consumer traffic from genuine sources. Clickbots artificially inflate the number of clicks as well as other key performance indicators in order to extract unwarranted sums from advertisers.[5]  Clickbots not only fraudulently increase CPC costs, but lower the overall efficacy of the advertiser's campaign, while resulting in increased marketing and IT support costs, decreased margins and lost revenue.

20.     To minimize the impact of click fraud, many advertisers insist upon a CPA model, wherein as previously referenced, they pay only upon the conversion of a specific action, be it a sale, a lead, a download or some other defined activity.  Characterized as the holy grail of online metrics, when properly employed, the CPA Model is considered the most accurate guide in determining the amount of marketing dollars needed to acquire a paying customer.

21.     However, as demonstrated by Permission Data's misconduct, the CPA model is also susceptible to fraud.

---

[2]  If a campaign stated $10.00 CPM, the advertiser pays $10.00 per thousand impressions, or 1 cent per ad view.

[3]  CPC stands for cost per click, and payment is premised on the number of clicks made onto the advertisement.

[4]  Cost Per Action or CPA (also known as Pay Per Action or PPA) is an online advertising pricing model, where the advertiser pays for each specified action; for example; a form submission, contact request, newsletter sign up, or sale.

[5]  AdWeek estimates that web bots steal an average of $6 billion dollars annually through fraudulent traffic and clicks.

**B.**     ***Permission Data Represents that its Anti-fraud TruFilter™ and TargetMark™ Technologies Help it Lead the Industry in "Honesty, Integrity and Performance."***

22.     On its website, Permission Data professes its "diligence" and "honesty, integrity and performance" to ensure valid data results:





(emphasis in original) (True and correct copies of snap shots of Permission Data's website are attached hereto as **Composite Exhibit 1**).

23.     Permission Data professes that its unwavering principles enables it to deliver unrivaled performance and genuine leads.

24.     Permission Data further represents that it employs a variety of prophylactic technologies and internal auditing practices in order to deliver on its promises of industry-leading validations, including:

a.      Permission Data's alleged creation and implementation of TruFilter™:

**TruFilter™**



**TruFilter™ is Permission Data's proprietary data validation and management system.** Utilizing best in class in-house technologies leveraging ten years of data validation experience ensures **clean, actionable leads** for our clients.  TruFilter™ is standard and cost free for all lead generation campaigns that are sourced through Permission Data.

b.      Permission Data's TargetMark™ email program, which ensures that all data provided by Permission Data is "maintained at the highest level;"

c.      Alleged monthly evaluations:



(*See* www.permissiondata.com; *see also*, Ex. 1).

C.      *Permission Data's Solicitations and Misrepresentations*.

25.     Permission Data initially attempted to attract Newsmax's business in April of 2013, with an unsolicited email. Thereafter, James Boruff, a Senior Account Executive at Permission Data – who had previous dealings with Newsmax during his prior employment at Value Click – contacted Lindsey Sprute, one of Newsmax's campaign managers.

26.     In attempting to secure Newsmax's business, Mr. Boruff repeatedly emphasized that Permission Data's stringent quality control would result in "clean, actionable" leads, as well as a demonstrable lift in key metrics.

27.     Mr. Boruff also noted that, given Permission Data's established network of smaller new sites and local television stations, Permission Data was capable of generating difficult-to-obtain leads and was willing to "put its money where its mouth was," by working on a CPA basis.  Specifically, Permission Data was willing to charge Newsmax solely for each ***new*** email address that it was able to generate by placing Newsmax's polls, surveys, and campaigns on third-party websites.

28.     In soliciting Newsmax's business during the fourth quarter of 2013 and first quarter of 2014,  Permission Data – and Mr. Boruff, in particular – repeatedly promised to provide: (a) diligently vetted, bona fide and valid third-party advertising networks, and (b) legitimate, non-computer generated user clicks and survey responses, including authentic opt-in email addresses.

29.     In reliance on Permission Data's repeated representations, Newsmax signed Permission Data's "Terms and Conditions" in February of 2014.[6]  (A true and correct copy of the "Terms and Conditions" is attached hereto as **Exhibit 2**).  While characterized in Permission

---

[6] Though executed by both parties in February of 2014, the agreement is dated December 18, 2013.

Data's Complaint as an "agreement," the document is designed rather to establish the terms of any forthcoming services that Newsmax may order.

**D.**     ***Newsmax's "Simple Heart Test" Campaign***.

30.     Newsmax launched its first campaign, the *Simple Heart Test*, with Permission Data on February 10, 2014.  The campaign was to run until June 30, 2014.

31.     The *Simple Heart Test* is a collaboration between www.newsmaxhealth.com and renowned cardiologist, Dr. Chauncey Crandall, the author of the #1 best-seller book entitled, "The Simple Heart Cure: The 90-Day Program to Stop and Reverse Heart Disease." The *Simple Heart Test* is an easy-to-complete, online test consisting of twenty (20) questions that enables the user to gauge their susceptibility to heart attack risk factors. (A print out of the *Simple Heart Test* is attached hereto as **Exhibit 3**).

32.     After completing the twenty question survey, each participant is prompted to enter their email address to receive their personalized result.

33.     The *Simple Heart Test* was designed to be a fertile source for leads, as any individual willing to devote the needed time and attention to complete the twenty (20) question[7] survey would presumably be interested in receiving their personalized result and, therefore, willing to provide an accurate email address.

34.     As reflected in the February 10, 2014 Insertion Order (the "First Insertion Order"), Permission Data was supposed to use banner advertisements to drive users to take the on-line survey at the *Simple Heart Test* landing page.  Permission Data was to be compensated for each new, viable lead – *i.e.*, for each email address that was not already in Newsmax's vast database. (A true and correct copy of the February 10, 2014 Insertion Order for the *Simple Heart Test* is attached hereto as **Exhibit 4**).

---

[7]  In contrast, most online surveys and polls average roughly six (6) inquiries.

35.     Pursuant to the terms of the First Insertion Order, Permission Data was to be paid $1.50 for each new lead up to a maximum of 2,500 "leads per day until [Newsmax] raises [the] cap via email notice."  (*Id.*).

36.     Further, each party was to monitor the other's system throughout the campaign to ensure the accuracy and veracity of the campaign's results.

37.     The initial results of the *Simple Heart Test* campaign appeared positive, as it was ostensibly generating viable new leads.

38.     Based on the initial belief that it had received legitimate, non-bot generated survey responses with authentic opt-in email addresses, Newsmax paid Permission Data $1,010,978.00 in connection with the *Simple Heart Test* campaign.

**E.     *Newsmax's Subsequent Campaigns*.**

39.     Further, in reliance on Permission Data's express representations, including subsequent misleading information provided by Mr. Boruff regarding the success of the *Simple Heart Test* campaign, Newsmax initiated a second campaign entitled, *Choice for GOP*, to solicit opinions as to which candidate would make the best Republican nominee for the 2016 Presidential Election.

40.     As was the case with the First Insertion Order, under the terms of the April 8, 2014 Insertion Order (the "Second Insertion Order"), Permission Data was to drive users to *Choice for GOP* landing page so that they could select their choice for the 2016 GOP nominee. (A true and correct copy of the April 8, 2014 Insertion Order for the *Choice for GOP* campaign is attached hereto as **Exhibit 5**).

41.     Unlike the *Simple Heart Test* campaign, the *Choice for GOP* survey consisted of only two questions.  In order for the user's casted vote to count, they had to enter a valid email

address.

42.     As was the case with the First Insertion Order, Permission Data was to be compensated for each new valid lead – *i.e.*, for each new email address.  Pursuant to the terms of the Second Insertion Order, Permission Data was to be paid $1.25 for each new lead up to a maximum of 2,500 "leads per day until [Newsmax] raises [the] cap via email notice."   (*Id.*).

43.     Further, each party was to monitor the other's system throughout the campaign to ensure the accuracy and veracity of the campaign's results.

44.     The initial results of the *Choice for GOP* campaign also appeared positive, as this second campaign was also ostensibly generating viable new leads.

45.     Based on its continued belief that Permission Data's activities were resulting in legitimate, non-bot generated survey responses with authentic opt-in email addresses and in continued reliance on Permission Data's express representations regarding the success of the campaigns, Newsmax engaged Permission Data on three additional campaigns, respectively entitled: "*Is Obama Hurting the Economy*," "*Free Book*" and "*Do You Support the President*."

46.     The *Is Obama Hurting the Economy* campaign is memorialized in an insertion order dated April 18, 2014 (the "Third Insertion Order"), a true and correct copy of which is attached hereto as **Exhibit 6**.

47.     The terms of the *Free Book* campaign are documented in an insertion order dated April 18, 2014 (the "Fourth Insertion Order"), a true and correct copy of which is attached hereto as **Exhibit 7**.

48.     Finally, the parameters of the *Do You Support the President* campaign are delineated in an insertion order dated May 16, 2014 (the "Fifth Insertion Order"), a true and correct copy of which is attached hereto as **Exhibit 8**.

49.     The terms of the Third, Fourth and Fifth Insertion Orders are substantively similar to the terms of the predecessor insertion orders; namely, that Permission Data was to use banner advertisements and text links to drive users to Newsmax's website with the objective of generating new and commercially viable leads.  In each instance, the number of daily leads were to be capped, absent Newsmax's express approval to raise the stated threshold, which ranged from a low of 500 daily leads (the *Free Book* campaign) to a high of 15,000 (in the case of the *Do You Support the President* campaign).  In exchange, Newsmax was to pay Permission Data a specified price – either $1.50 or, in the case of the Fourth Insertion Order, $1.75, for each valid lead.

50.      Given the volume of leads that Permission Data was ostensibly generating, Newsmax was dependent, in part, on Permission Data's assurances that Permission Data – consistent with its espoused values of "honesty, integrity and performance" – was filtering all of the opt-in information through its purported proprietary software and internal audit practices to ensure the delivery of "clean, actionable leads."

**F.     Newsmax detects conspicuous anomalies indicating fraud by Permission Data.**

51.     In approximately May of 2014, Newsmax began harboring questions regarding the authenticity of the email addresses provided by Permission Data as none the subsequent activities that often follow a successful campaign came to fruition.

52.     A preliminary review of a portion of the data provided by Permission Data in connection with the *Simple Heart Test* campaign revealed several conspicuous anomalies highly suggestive that the surveys were completed ***not*** by actual humans, but were instead the product of an algorithm designed – albeit crudely, given a bot's inability to correctly respond to thoughtful questions – to create the illusion of viable email addresses.  By way of example:

- 41.9% of the alleged survey participants purported to be less than 5 feet tall;

- Over 17,685 of the alleged participants weigh less than 50 pounds, while more than 1,370 of the purported participants tip the scales ***at over 10,000 pounds***;

- A significant number of the surveys contained default responses, with tens of thousands of the survey questionnaires containing near-identical responses ("no's" across the board);

- A high volume of the surveys were purportedly completed by female participants with common male names, and vice versa;

- There were a disproportionally high number of emails utilizing Hotmail and Outlook domain names, while a considerable number of the email addresses utilized non-existent domains (*e.g.*, hushmail.com, mailinator.com, yopmail.com, etc.);

- There were an inordinate percentage of conspicuously similar, yet unusual email addresses.  By way of example, there were thirty one (31) email addresses  consisting of some variation of the name, "Willie" or "William," followed by an underscore, a capital "V" and a three number code – *see, e.g.*:

    - william_V389@hotmail.com
    - william_V936@hotmail.com
    - william_V119@hotmail.com

53.    Many of the surveys resulted in perplexing, if not irreconcilable results.  Some examples the mismatches, include:

- RickSaal1974@gmail.com is a 48" tall, 70 pound female born in 1974
- Donnababbit1989@outlook.com  is a 48" tall, 170 pound male born in 1989
- ChristopherWade1970@hotmail.com  is a 48" tall, 45 pound, female born in 1970
- StanleyUrbaniuk1964@hotmail.com is a 84" tall, 67 pound, female born in 1964

54.    Further, an extraordinarily high number (approximately 86.7%) of the "email subscribers" either never clicked or opened the follow-up email sent from Newsmax resulting in a "hard bounce."  By point of comparison, when the same campaign was run on Google™, the resulting hard bounce rate was less than 24%.

55.    Collectively, these email anomalies – particularly when viewed together with the lack of any meaningful increase in performance benchmarks (*i.e.,* new user activity) – create a

stench of fraud.

56.     Because malicious bots could theoretically be released by uninterested saboteurs and wannabe hackers, Newsmax decided to investigate these anomalies before reductively concluding that Permission Data – despite being the only party that: (a) stood to gain financially from such fraudulent activity, and (b) possessed the promotional codes – was indeed the culprit.

57.     Newsmax's preliminary investigation eliminated any reasonable doubt:  the leads supplied by Permission Data are commercially unviable and the product of fraudulent activity.[8]

58.     The most damning evidence is that several of **_same email addresses simultaneously participated in all of Newsmax's campaigns_**.[9]  Permission Data tendered to Newsmax the email addresses of a number of purported users who completed all twenty questions contained in the _Simple Heart_ campaign and responded to the _Choice for GOP_ survey (which were extremely unlikely to be found on the same webpage) within less than .032 seconds. This defies the laws of physics, the limits of human dexterity, and common sense – while affirmatively ruling out the possibility that the bot activity that vitiated Newsmax's campaigns is a random coincidence.

59.     A human cannot answer multiple online surveys in a fraction of second; but a bot can.  Permission Data, its data-integrity representations notwithstanding, systematically hit all four of Newsmax's campaigns with bots that triggered fraudulent email leads and precipitated ill-gotten payments to Permission Data.

**G.     Newsmax cries fraud and demands a refund, but gets sued instead**.

60.     On August 1, 2014, Newsmax's principals contacted Eric O'Neill, the Permission

---

[8]  Newsmax's internal investigation was on-going at the time that Permission Data filed its complaint.

[9]  The _Free Book_ campaign was short-lived and was ostensibly not victimized by Permission Data's bot as the total campaign resulted in less than a handful of new leads.

Data's President, to communicate its concerns regarding Permission Data's actions and demanded a full refund of the $1,010,978.00 that Newsmax had already paid Permission Data.

61.     Mr. O'Neill denied any wrong-doing, while incongruously expressing surprise that Newsmax did not detect the fraud earlier.

62.      Rather than attempt to make any effort to address its wrongdoing, Permission Data instead had its counsel hastily file a complaint (the next business day), demanding that Newsmax pay the remaining $274,401.50 purportedly owed in connection with the fraudulently provided leads.

## COUNT I
## FRAUDULENT INDUCEMENT

63.     Newsmax hereby re-alleges each of the allegations contained in paragraphs 1 through 62, as if fully set forth herein.

64.     With the intent to deceive and for the express purpose of inducing Newsmax into entering into its Terms and Conditions, as well as each of the five separate insertion orders (collectively, the "Agreements"), Permission Data, both orally (through Mr. Boruff, Christopher Ambrosio, its Chief Revenue Officer, and Ming-Ni Yeh, its Senior Account Manager), as well as in writing knowingly and intentionally misrepresented, among other things, that Permission Data:

- Has an unwavering commitment to delivering reliable and clean leads;

- Has been delivering positive results for hundreds of brand advertisers since 2002;

- Employs stringent, quality control processes, including a proprietary data validation and management system, to ensure the delivery of "clean, actionable leads;"

- Conducts monthly frequent evaluations to ensure quality and performance;

- Diligently vets all third-party websites that it uses; and

- Supplies legitimate, non-bot generated user clicks and survey responses;

- Does not utilize bots to create artificially enhanced click activity.

65.   Permission Data's misrepresentations were made at least as early as April of 2013 and made repeatedly throughout the course of the parties' negotiations, which culminated in the execution of the Agreements.

66.   Permission Data's representations were material to Newsmax in that, among other things, Permission Data knew that Newsmax wished to expand its email database with new, viable email addresses, as well as the fact that Permission Data was to supply and be compensated solely for new, commercially-viable email addresses.

67.   At the time it made these misrepresentations, Permission Data knew their representations to Newsmax were false.

68.   As Permission Data intended, Newsmax reasonably and justifiably relied on Permission Data's false representations and was thereby induced to, among other things, agree to Permission Data's Terms and Conditions and enter into the five (5) resulting insertion orders (collectively, the "Insertion Orders") and to pay Permission Data a minimum of $1,010,978.00.

69.   As a direct and proximate result of Permission Data's knowing and/or reckless misrepresentations, Newsmax has been injured in that it was misled into paying $1,010,978.00 for fraudulent, commercially unviable leads, while simultaneously losing revenue that would have resulted from viable leads, and incurring increased IT support costs.

**WHEREFORE**, Newsmax respectfully prays that this Court enter a judgment in its favor and against Permission Data for actual and compensatory damages in an amount not less than three million dollars ($3,000,000.00) as to be determined at the final hearing in this matter,

together with its attorneys' fees and costs, all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper, including punitive damages.

## COUNT II
## BREACH OF CONTRACT

70.     Newsmax hereby re-alleges each of the allegations contained in paragraphs 1 through 62, as if fully set forth herein.

71.     Newsmax signed Permission Data's Terms and Conditions and later entered into the Insertion Orders.

72.     Each Insertion Order incorporates the Terms and Conditions by reference.

73.     Pursuant to the parties' agreements ("Agreements"), Permission Data contractually agreed to distribute Newsmax's campaigns on a CPA pricing model. Specifically, Permission Data was to be paid a specifically-negotiated per lead price (ranging from a low of $1.25 to a high of $1.75) for each new, valid commercially viable lead.

74.     The Terms and Conditions provides, in pertinent part, that: a "Valid Lead" is one in which "an *individual person* [has] (i) submitted information that meets all of [Newsmax's] criteria set forth in the applicable [insertion order], and (ii) is not a Duplicate Lead."

75.     Each of the Insertion Orders expressly provide that "Newsmax will only pay for new to file leads."

76.     Permission Data breached the Agreements by providing and charging Newsmax for fraudulent, invalid leads.

77.     Newsmax timely fulfilled and performed all of its obligations under the Agreements.

78.     As a direct and proximate result of Permission Data's breaches of the Agreements, Newsmax has incurred actual and substantial monetary damages, and will continue

to incur such damages, in an amount to be determined at the final hearing in this matter.

**WHEREFORE**, Newsmax respectfully prays that this Court enter a judgment in its favor and against Permission Data for actual and compensatory damages in an amount not less than three million dollars ($3,000,000.00) as to be determined at the final hearing in this matter, together with its attorneys' fees and costs, all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT III
<u>**BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**</u>

79.     Newsmax hereby re-alleges each of the allegations contained in paragraphs 1 through 62, as if fully set forth herein.

80.     Included in the Agreements is an implied covenant of good faith and fair dealing by which Permission Data agreed not to deprive Newsmax of the full benefits of the parties' Agreements, and not to take any action with the motive to frustrate Newsmax's rights under the Agreements.  The covenant encompasses a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

81.     After agreeing to Permission Data's Terms and Conditions, Newsmax entered into the five Insertion Orders each of which required Permission Data to place Newsmax's campaigns on diligently vetted, bona fide, third-party publishers, and to employ its alleged proprietary data validation and management systems to produce clean, actionable leads.

82.     Permission Data deliberately and knowingly breached its implied covenant of good faith and fair dealing in that it has, in bad faith and with a motive to intentionally frustrate, destroy or injure Newsmax's enjoyment of its rights under the Agreements by:

- failing to employ stringent, quality control processes, including its professed

proprietary data validation and management system, to ensure the delivery of "clean, actionable leads;"

- failing to conduct the promised, frequent evaluations to ensure quality and performance;

- failing to diligently vet the third-party sites in which it placed Newsmax's campaigns;

- activating bot technology; and

- lying to and misleading Newsmax

83.     Permission Data has further breached the implied covenant of good faith and fair dealing by failing to exercise the "reasonable discretion" afforded to it in determining the validity of a lead and by arbitrarily, capriciously and irrationally determining that the disputed leads – despite possessing all known badges of fraud – are, in fact, valid leads.  Permission Data's refusal to both proactively investigate the authenticity of the email addresses, as well as to subsequently consider relevant material that reveals the illegitimacy of the email addresses, constitutes a breach of the implied covenant of good faith and fair dealing.

84.     Permission Data's unfair dealing has frustrated the parties' agreed upon common purposes and vitiated not only Newsmax's reasonable expectations, but Newsmax's benefit of the bargain.

85.     Permission Data has acted in bad faith with the express goal of destroying Newsmax's rights to enjoy the benefits of the Agreements, while simultaneously profiteering from fraudulent activity.

86.     As a direct and proximate result of Permission Data's intentional, purposeful and willful bad faith violation of the Agreements' implied covenant of good faith and fair dealing, Newsmax has suffered harm and should be provided with a full refund of all amounts paid to date, as well as be awarded damages in an amount not less than three million dollars

($3,000,000.00).

87.    **WHEREFORE**, Newsmax respectfully prays that this Court enter a judgment in its favor and against Permission Data for actual and compensatory damages in an amount not less than three million dollars ($3,000,000.00) to be determined at the final hearing in this matter, together with its attorneys' fees and costs, all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

**COUNT IV**
**FRAUD**

88.    Newsmax hereby re-alleges each of the allegations contained in paragraphs 1 through 62, as if fully set forth herein.

89.    As referenced in greater detail herein, Permission Data systematically activated concerted bot technology that triggered fraudulent email leads and precipitated ill-gotten payments to Permission Data.

90.    After engaging in this furtive activity, Permission Data compounded its initial deceit by perpetrating a scene designed to frustrate Newsmax's pursuit of its contractual remedies by intentionally shielding its fraudulent activity from detection.

91.    Pursuant to the Terms and Conditions, Newsmax was obligated to raise a challenge to any invoice issued by Permission Data within an incredibly narrow window of time (ten business days). Specifically, paragraph 8 provides: "[Newsmax] shall have ten (10) business days from its receipt of an invoice to notify Permission Data of any dispute relating to such invoice. If Advertiser fails to notify Permission Data within such ten (10) business day period, such invoice shall then be deemed final and binding."[10]

---

[10]   While New York law, which governs the Agreements, permits contracting parties to contractually shorten the statute of limitations of the period of time in which specific activity must be undertaken, the altered period must be reasonable under the circumstances to be enforceable.   No New York authority has found a ten (10) business

92.     By tendering a voluminous number of fraudulent leads incapable of expeditious review while simultaneously confirming the success of each respective campaign by lauding the high volume of leads, Permission Data thwarted Newsmax's ability to immediately detect the underlying deceit (*e.g.*, the malicious utilization of bot technology to spuriously spike the number of alleged leads).

93.     Throughout the course of each of the campaigns, Permission Data, specifically Mr. Boruff and Ms. Yeh were in frequent contact with Newsmax's respective campaign managers. In fact, Permission Data and Newsmax would submit frequent reports comparing their respective numbers as to which leads appeared to be new, and therefore, commissionable. During the exchange of these reports, Mr. Boruff and Ms. Yeh repeatedly confirmed the purported validity of the leads.   In so doing, Permission Data's representatives expressly represented that Newsmax could comfortably rely upon Permission Data's prophylactic and cutting-edge technologies as well as Permission Data's internal auditing practices as to the authenticity and accuracy of the reported leads.

94.     Permission Data knowingly made false statements as to the authenticity and accuracy of the reported leads in order to preclude, or minimally delay, Newsmax's ability to detect the fraudulent nature of the leads.

95.     Newsmax has suffered harm and should be provided with a full refund of all amounts paid to date, as well as awarded damages in an amount to be proven at trial.

**WHEREFORE**, Newsmax respectfully prays that this Court enter a judgment in its favor and against Permission Data for actual and compensatory damages in an amount not less

---

window to be reasonable.  *See, e.g., Fitzpatrick & Weller, Inc. v. Miller*, 309 A.D. 1273 (4th Dep't 2003) (finding fourteen days to be unreasonable)' *USA Holdings, Inc. v. Tse-Peo, Inc.*, 23 Misc.3d 1114(A), 886 N.Y.S.2d 69 (N.Y. Sup. 2009) (finding 60 day contractual limitation unreasonable in light of the circumstances under which the contract was to be performed).

than three million dollars ($3,000,000.00) to be determined at the final hearing in this matter, together with its attorneys' fees and costs, all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper, including punitive damages.

**COUNT V**
**UNJUST ENRICHMENT**

96.    Newsmax hereby re-alleges each of the allegations contained in paragraphs 1 through 62, as if fully set forth herein.

97.    Newsmax has conferred a benefit to Permission Data in the form of the remittance of funds totaling $1,010,978.00.

98.    Permission Data, with full knowledge that it was being paid for fraudulent leads generated by bot activity, accepted Newsmax's payments.

99.    By virtue of its receipt of these unearned and fraudulently obtained amounts, Permission Data has been unjustly enriched and received a benefit to which it is not entitled.

100.    Permission Data has been unjustly enriched at Newsmax's expense.  Equity and good conscience militate against permitting Permission Data to retain what it acquired through purposeful deceit.

101.    It is inequitable under the circumstances to allow Permission Data to retain the full benefit of the $1,010,978.00 that has been unjustly bestowed upon it.

**WHEREFORE**, Newsmax respectfully prays that this Court enter a judgment in its favor and against Permission Data for actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with its attorneys' fees and costs, all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Newsmax demands a trial by

jury in this action of all issues so triable.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Newsmax respectfully prays for the following relief:

a.    that the Court dismiss Permission Data's Complaint in its entirety with prejudice;

b.    that the Court deny each and every demand and prayer for relief in Permission Data's Complaint;

c.    that the Court grant judgment in Newsmax's favor on all counts contained in the Counterclaim;

d.    that the Court award damages to Newsmax in an amount not less than three million dollars ($3,000,000.00) as proven at trial, plus all pre-judgment and post-judgment interest to the fullest extent permitted by law;

e.    that the Court award Newsmax its attorneys' fees and costs; and

f.    that the Court grant such other and further relief as the Court deems just, proper and equitable, including punitive damages and issuing the appropriate injunctive or other equitable relief to prevent Permission Data from continuing to defraud its customers.

Dated:   September 9, 2014
         New York, New York

                                                 Respectfully submitted,

**STROOCK & STROOCK & LAVAN LLP**
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400

Southeast Financial Center
200 South Biscayne Blvd., Suite 3100
Miami, Florida  33131
Telephone: (305) 358-9900
Facsimile: (305) 416-2888
jsammataro@stroock.com

By:  s/ James G. Sammataro
      James G. Sammataro
      New York Bar Number: 4937926